**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **IN RE: TESTOSTERONE REPLACEMENT THERAPY PRODUCTS LIABILITY LITIGATON** | **MDL No. 2545**<br><br>**Master Docket Case No. 1:14-cv-01748**<br><br>**Honorable Matthew F. Kennelly** |
| **ANTHONY AND LAURA JONES,**<br><br>**Plaintiffs,**<br><br>Vs.<br><br>**AUXILIUM PHARMACEUTICALS, INC.**<br><br>**Defendant.** | **COMPLAINT AND JURY DEMAND**<br><br>**Civil Action No.:_____** |

## CIVIL ACTON COMPLAINT

Plaintiffs Anthony and Laura Jones, by and through the undersigned counsel, hereby alleges against Auxilium Pharmaceuticals, Inc. the following:

### INTRODUCTION

1.      This case involves the prescription drug Testopel, which is manufactured, sold, distributed, marketed and promoted by Defendant as a testosterone replacement therapy.

2.      Defendant misrepresented that Testopel is safe and effective treatment for hypogonadism or "low testosterone," when in fact the drug causes serious medical problems, including life-threatening cardiac events, strokes, and thrombolytic events.

3.      Defendant and other unnamed pharmaceutical corporations involved in the manufacture, sale, distribution, marketing and promotion of testosterone replacement therapy products, collectively engaged in aggressive direct-to-consumer and physician promotion,

1

marketing, and advertising to create and expand a market for testosterone replacement therapy including Defendant's Testopel product further engaged in an aggressive unbranded "disease awareness" campaign to alert men that they might be suffering from "Low T."

4.     The FDA has not approved any testosterone replacement therapy drug as a treatment for low testosterone or "Low T".  Additionally, low testosterone is not a disease recognized by the medical community. Instead, it is a normal result of the aging process experienced by the majority of males.

5.     As a result of this "disease mongering," as termed by Dr. Adriene Fugh-Berman of Georgetown University Medical Center, diagnoses of "Low T" have increased exponentially.

6.     Consumers of Testopel and their physicians relied on the companies false representations and were misled as to the drug's safety and efficacy, and as a result have suffered injuries including life-threatening cardiac events, strokes, and thromboembolic events.

7.     As a result, there has been an exponential increase in individuals being diagnosed with Low T.  This has directly related to the increase of Testosterone sales to more than several hundred million dollars per year.

8.     However, consumers of testosterone, including Testopel, were misled as to the drug's safety and efficacy, and as a result have suffered injuries, including life-threatening cardiac events, strokes, thrombolytic events, and death.

## PARTIES

9.     Plaintiff Anthony Jones was at all relevant times a resident and citizen of Prairieville, Ascension Parish, Louisiana.

10.     Plaintiff Laura Jones was at all relevant times a resident and citizen of Prairieville, Ascension Parish, Louisiana.

2

11.     At all relevant times hereto, Anthony and Laura were husband and wife residing together as such.

12.     Defendant Auxilium Pharmaceuticals, Inc. (Auxilium) is a corporation existing under the laws of incorporation of the State of Delaware, 640 Lee Road, Chesterbrook, Pennsylvania 19087.  At all times relevant to this Complaint, Auxilium was engaged in the business of designing, testing, studying, researching, evaluating, endorsing, formulating, compounding, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, advertising, packaging, selling, prescribing, or otherwise placing Testopel in the stream of interstate commerce of the United States, including Louisiana.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over Defendant and this action pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship between Plaintiffs and Defendant; because the amount in controversy exceeds $75,000.00, exclusive of interest and costs; and because, among other reasons, Defendant has significant contacts with this district by virtue of doing business within this judicial district.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant is subject to personal jurisdiction within this district.

## GENERAL ALLEGATIONS

15.     This action is for damages and other relief brought on behalf of Plaintiffs Anthony and Laura Jones upon information and belief that Plaintiff Laura who was prescribed and supplied with, received, and was injected with the prescription drug Testopel, as tested, studied, researched, evaluated, endorsed, designed, formulated, compounded, manufactured, produced, processed, assembled, inspected, distributed, marketed, labeled, promoted, packaged,

advertised for sale, prescribed, sold or otherwise placed in the stream of interstate commerce by the Defendant. This action seeks, among other relief, general and special damages and equitable relief in order to enable the Plaintiffs Anthony and Laura Jones to treat and monitor the dangerous, severe and life-threatening side effects caused by this drug suffered by Plaintiff Anthony Jones.

16. Defendant's wrongful acts, omissions, and fraudulent misrepresentations caused Plaintiffs' injuries and damages.

17. At all times herein mentioned, the Defendant was engaged in the business of, or were successors in interest to, entities that were engaged in the business of research, licensing, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging, advertising for sale, and/or selling the prescription drug Testopel for use by Plaintiff, Anthony Jones.

18. At all times herein mentioned, the officers and directors of Defendant participated in, authorized, and directed the production and promotion of the pertinent products when they knew, or with the exercise of reasonable care should have known, of the hazards and dangerous propensities of said products, and thereby actively participated in the tortious conduct which resulted in the injuries suffered by the Plaintiffs.

19. Plaintiffs file this lawsuit within the applicable limitations period of first suspecting Defendant's medication caused the appreciable harm sustained by the Plaintiffs.

## Introduction to Testosterone Therapy

20. Testopel is a testosterone containing pellet that is implanted under the skin to provide a continuous 24 hour delivery of testosterone and is approved by the Food and Drug Administration as a testosterone replacement product.

4

21.     Testosterone is a primary androgenic hormone responsible for normal growth, development of the male sex organs, and maintenance of secondary sex characteristics.

22.     The hormone plays a role in sperm production, fat distribution, maintenance of muscle strength and mass, and sex drive.

23.     In men, testosterone levels normally begin a gradual decline after the age of thirty.

24.     The average testosterone levels for most men range from 300 to 1,000 nanograms per deciliter of blood.  However, testosterone levels can fluctuate greatly depending on many factors, including sleep, time of day, and medication.  Resultantly, many men who fall into the hypogonadal range one day will have normal testosterone levels the next.

25.     Hypogonadism is a specific condition of the sex glands, which in men may involve the diminished production or nonproduction of testosterone.

26.     In or about 1999, it was estimated that hypogonadism was estimated to affect approximately "one million American men."

27.     In 2000, pharmaceutical companies involved in testosterone replacement therapy estimated that the market was "four to five million American men."  By 2003, the number increased to "up to 20 million men."  However, a study published in the *Journal of the American Medical Association* ("JAMA") in August 2013 entitled "Trends in Androgen Prescribing in the United States, 2001-2011" indicated that many men who get testosterone prescriptions have no evidence of hypogonadism. For example, one third of men prescribed testosterone had a diagnosis of fatigue, and one quarter of men did not even have their testosterone levels tested before they received a testosterone prescription.

28.     Testosterone replacement therapy involves the administration of exogenous testosterone into the male body in an attempt to raise the serum level of total testosterone. This is achieved through the placement of a time-released pellet. Testosterone can also be delivered into the body by applying a cream, gel, injection, or patch directly to the skin for transdermal absorption into the body.

### Risks of Testosterone Therapy

29.     The absorption of exogenous testosterone into the male body can cause an increase in serum levels of testosterone, and also result in an increase in hematocrit[1] and serum estradiol levels[2]. It can also cause increased platelet aggregation and vasoconstriction.

30.     Hematocrit is the proportion of total blood volume that is comprised of red blood cells. Erythrocytosis is an increase in the number of circulating red blood cells especially resulting from a known stimulus (like Testosterone). When a person's hematocrit level is raised through erythrocytosis, the resulting condition is called polycythemia, which simply means an elevated red blood cell count. The range for normal hematocrit levels in adult males is 44%-48%.

31.     The administration of exogenous testosterone causes a 7%-10% increase in hematocrit levels in adult males through the process of erythrocytosis.[3] An increase of hematocrit that is 7%-10% above normal range is a significant elevation and qualifies as polycythemia. This is a serious medical condition that requires treatment to prevent injury.

---

[1] Fernandez-Balsells, M., et al., "Adverse Effects of Testosterone Therapy in Adult Men: A Systematic Review and Meta-Analysis." *J Clin Endocrinol Metab*, June 2010, 95(6):2560–2575.

[2] Finkelstein, JS, et al., "Gonadal Steroids and Body Composition, Strength, and Sexual Function in Men." *N Engl J Med* 2013;369:1011-22.

[3] Bachman, E., et al. "Testosterone Induces Erythrocytosis via Increased Erythropoietin and Suppressed Hepcidin: Evidence for a New Erythropoietin/Hemoglobin Set Point." *J Gerontol A Biol Sci Med Sci.*, 2013.

32.     Elevated hematocrit is an independent risk factor for stroke and it interacts synergistically with elevated blood pressure.  In a published study[4] the cohort for men with a hematocrit level greater than or equal to 51% had more than double the risk of stroke (RR=2.5), and among males in the cohort who were also hypertensive, those with hematocrit greater than or equal to 51% had a nine-fold increase in the risk of stroke.

33.     Elevated hematocrit is also an independent risk factor for adverse cardiovascular events.  Using data from the Framingham Heart Study, researchers documented a strong, graded relationship between hematocrit level and the risk of developing heart failure.  Among 3,523 Framingham participants, aged 50-65, who were free of a history of heart failure at baseline and were followed prospectively for up to 20 years, individuals with a hematocrit level greater than or equal to 50% had almost double the risk of new-onset heart failure during follow-up, compared with those with a low hematocrit, even after adjustment for conventional risk factors for heart failure.[5]

34.     In another study of 680 males conducted over 28 years in Finland, the data showed that men with a hematocrit level greater than or equal to 50% were 2.4 times more likely to die from coronary heart disease than men with hematocrit levels less than 50%. Even after adjusting for established coronary risk factors, the increased risk remained 1.8-fold for the higher hematocrit cohort.[6]

---

[4] Wannamethee G1, Perry IJ, Shaper AG, "Haematocrit, hypertension and risk of stroke." *J Intern Med.* 1994 Feb;235(2):163-8.

[5] Coglianese, E., et al., "Usefulness of the Blood Hematocrit Level to Predict Development of Heart Failure in a Community." *Am J Cardiol*. Jan 15, 2012; 109(2): 241–245. Published online Oct 12, 2011

[6] Kunnas, T, et al., "Hematocrit and the risk of coronary heart disease mortality in the TAMRISK study, a 28-year follow-up." *Prev. Med*. Volume 49, Issue 1, July 2009, Pages 45–47.

35.     In yet another large, prospective study[7] in Norway, the data show a hazard ratio of 1.25 per 5% rise in hematocrit. In a category-based analysis, a hematocrit level in the upper 20th percentile was found to be associated with a 1.5-fold increased risk of venous thrombosis, and a 2.4-fold increased risk of unprovoked venous thromboembolism compared to men whose hematocrit was in the lower 40th percentile.

36.     An increase in the level of hematocrit also causes an increase in the viscosity of the blood. A 10.99% increase of hematocrit produces an increase of 1 unit relative viscosity, which means approximately a 20% increase in blood viscosity for a healthy individual.[8] An increase in blood viscosity is a known risk factor for ischemic heart disease[9], and it can cause hypertension; blood pressure increase will be 20% or vasodilation will be 4.66% in radius for the physiologic compensation of 20% increased viscosity. Hypertension is a known cause of atherosclerosis, heart failure, and stroke.  Testosterone makes blood thick and viscous, which, in turn, can cause numerous health risks and injuries for patients.

37.     The major source of estradiol in men comes from the aromatization of testosterone (endogenous and/or exogenous) to estradiol.  When men are given testosterone, either by application of an androgen gel or by injection, some of that testosterone is converted by the body (aromatized) to estradiol.[10]  The increase of estradiol is in direct

---

[7] Braekkan SK, Mathiesen EB, et al., "Hematocrit and risk of venous thromboembolism in a general population. The Tromso study." *Haematologica*. 2010 Feb; 95(2):270-5.

[8] Cinar, Y., et al., "Effect of hematocrit on blood pressure via hyperviscosity." *Am J Hypertens*. 1999 Jul;12(7):739-43.

[9] Yarnell, JW, et al., "Fibrinogen, viscosity, and white blood cell count are major risk factors for ischemic heart disease. The Caerphilly and Speedwell collaborative heart disease studies." *Circulation*. 1991 Mar;83(3):836-44.

[10] Glueck, CJ, et al., "Thrombotic events after starting exogenous testosterone in men with previously undiagnosed familial thrombophilia." *Trans. Res*. Oct. 2011.

relation to the amount of the dose of exogenous testosterone delivered; the higher the dose of testosterone, the higher the level of serum estradiol.[11]

38.     In data gathered from 2,197 men who participated in the Honolulu Aging Study from 1991-1993, and who were followed for thromboembolic and hemorrhagic events until 1998, there was a two-fold excess risk of stroke for men who had serum estradiol levels in the top quintile versus those men whose estradiol levels were lower.[12] This study revealed that estradiol blood levels greater than 34.1 pg/mL resulted in this more than doubling of stroke incidence. As a source of embolism, the authors noted that the prevalence of atrial fibrillation rose significantly from 1.0 to 4.4% from the bottom to the top estradiol quintiles.   Atrial fibrillation is a known cause of thrombus formation.

39.     If men have an underlying inherited trait which increases their risk of blood clotting, particularly the Factor V Leiden mutation, the Prothrombin gene mutation, high Factor VIII, high homocysteine, or the lupus anticoagulant, then the estradiol can interact with the underlying clotting trait to produce blood clots in the legs, the lungs, the eyes, the brain, and the bones.[13]

40.     In a study published in 2006, blood levels of estradiol were measured in 313 men whose average age was 58. Carotid artery intima-media thickness was measured at baseline and then three years later. After adjusting for other risk factors, men with higher levels of estradiol suffered a worsening thickening of their carotid artery wall. This led the researchers to conclude,

---

[11] Finkelstein, JS, et al., "Gonadal Steroids and Body Composition, Strength, and Sexual Function in Men." *N Engl J Med* 2013;369:1011-22.

[12] Abbott, RD, et al., "Serum Estradiol and Risk of Stroke in Elderly Men." *Neurology* 2007, 68:563-568.

[13] Glueck, CJ, et al., "Testosterone, thrombophilia, thrombosis." *Blood Coagulation and Fibrinolysis* 2014, 25:00–00.

"circulating estradiol is a predictor of progression of carotid artery intima-media thickness in middle-aged men."[14] These findings of a positive association between serum estradiol levels and intima-media thickening support the notion that estrogens, besides possibly increasing the risk for thrombosis and thereby cardiovascular events, also have an important impact on atherogenesis in men.

41. In a case control study of men in the Framingham cohort, *supra*, serum estradiol levels were significantly increased in subjects with coronary heart disease.[15]

42. Estradiol has a greater effect on the male heart through the regulation of gene expression than it does on the female heart. This effect results in impaired contractile function of the male heart with elevated levels of serum estradiol.[16] Impaired contractile function results in numerous cardiovascular injuries and disease.

43. A study published in 2007 compared blood levels of testosterone and estradiol in men suffering acute myocardial infarction (heart attack) with those who had previously suffered a heart attack. Sex hormones were measured in patients presenting with acute heart attack, patients with old heart attack, and patients with normal coronary arteries. The results showed significantly higher levels of estradiol in both groups of heart attack patients compared with those without coronary disease.[17] In another study, men admitted to the hospital with acute heart

---

[14] Tivesten, A., et al., "Circulating Estradiol is an Independent Predictor of Progression of Carotid Artery Intima-Media Thickness in Middle-Aged Men." *J Clin Endocrinol Metab*, November 2006, 91 (11): 4433-4437.

[15] Phillips GB, Castelli WP, Abbott RD, et al., "Association of Hyperestrogenemia and Coronary Heart Disease in Men in the Framingham Cohort." *Am J Med*, 1983 74:863-869.

[16] Kararigas, G., et al., "Transcriptome Characterization of Estrogen-Treated Human Myocardium Identifies Myosin Regulatory Light Chain Interacting Protein as a Sex-Specific Element Influencing Contractile Function." *JACC* Vol. 59, No. 4, January 24, 2012, 2012:410-7.

[17] Mohamad MJ, Mohammad MA, Karayyem M, Hairi A, Hader AA. "Serum levels of sex hormones in men with acute myocardial infarction." *Neuro Endocrinol Lett*. 2007 Apr;28(2):182-6.

attacks whose levels of sex hormones were evaluated. Compared with control patients, estradiol levels in these heart attack patients were 180% higher, while bioavailable testosterone levels were nearly three times less than those of control patients.[18]

44.    High testosterone levels enhance acute myocardial inflammation, adversely affecting myocardial healing and early remodeling, as indicated by increased cardiac rupture, and possibly causing deterioration of cardiac function after myocardial infarction. Conversely, estrogen seems to have no significant protective effect in the acute phase after myocardial infarction.[19]

45.    Thromboxane A2 (TXA2) is a vasoconstrictor and platelet pro-aggregatory agent that has been implicated in the pathogenesis of cardiovascular disease.  Thromboxane A2 has been unequivocally implicated in a range of cardiovascular diseases, owing to its acute and chronic effects in promoting platelet aggregation, vasoconstriction and proliferation.  A study published in 1995 demonstrated that testosterone treatment was associated with a significant increase in the maximum platelet aggregation response and this effect may contribute to the thrombogenicity of androgenic steroids like testosterone.[20]

46.    In 2010, a *New England Journal of Medicine* study entitled "Adverse Events Associated with Testosterone Administration" was discontinued after an exceedingly high number of men in the testosterone group suffered adverse events.

---

[18] Pugh PJ, Channer KS, Parry H, Downes T, Jone TH. "Bio-available testosterone levels fall acutely following myocardial infarction in men: association with fibrinolytic factors." *Endocr Res*. 2002 Aug;28(3):161-73.

[19] Maria A. Cavasin , Zhen-Yin Tao , Ai-Li Yu , Xiao-Ping Yang; *American Journal of Physiology - Heart and Circulatory Physiology* Published 1 May 2006 Vol. 290 no. H2043-H2050 DOI: 10.1152/ajpheart.01121.2005

[20] Ajayi, A., et al., "Testosterone Increases Human Platelet Thromboxane A2 Receptor Density and Aggregation Responses." *Circulation*. 1995; 91: 2742-2747.

47.     In November of 2013, a *Journal of the American Medical Association* study was released entitled "Association of Testosterone Therapy with Mortality, Myocardial Infarction, and Stroke in Men with Low Testosterone Levels", in which a large cohort of male testosterone users was compared against a cohort of men who did not use testosterone. The study concluded that "Use of testosterone therapy in this cohort of veterans with significant medical comorbidities was associated with increased risk of mortality, MI, or ischemic stroke."  In fact, testosterone therapy increased the risk of death, heart attack, and stroke by approximately 30%.

48.     On January 29, 2014, a study was released in PLOS ONE entitled "Increased Risk of Non-Fatal Myocardial Infarction Following Testosterone Therapy Prescription in Men." The study indicated that testosterone use doubled the risk of heart attacks in men over 65 and men younger than 65 with a comorbid condition. The conclusion of this published study was that the risk of myocardial infarction following initiation of testosterone therapy prescription is substantially increased.

49.     In a study published in 2013[21], based on a systematic review and meta-analysis of placebo-controlled randomized trials of testosterone therapy among men lasting 12+ weeks and reporting cardiovascular-related events, two reviewers independently searched, selected and assessed study quality with differences resolved by consensus. Additionally, two statisticians independently abstracted and analyzed data, and concluded that testosterone therapy increased the risk of a cardiovascular-related event. Their meta-analysis of the published literature also showed that the effect of testosterone therapy varied with source of funding. In trials not funded by the pharmaceutical industry the risk of a cardiovascular-related event on testosterone therapy

---

[21] Xu, L., et al., "Testosterone therapy and cardiovascular events among men: a systematic review and meta-analysis of placebo-controlled randomized trials." *BMC Medicine* 2013, 11:108.

was greater than in pharmaceutical industry funded trials. The study concluded that the existing body of published medical literature demonstrated that in trials not funded by the pharmaceutical industry, exogenous testosterone increased the risk of cardiovascular-related events, with corresponding implications for the use of testosterone therapy.

50.     In some patient populations, testosterone use can increase the incidence of adverse events and death by over 500%.

## The Marketing of Testosterone Drugs

51.     Defendant and other unnamed pharmaceutical corporations involved in the manufacture, sale, distribution, marketing and promotion of testosterone replacement therapy products collectively coordinated a massive marketing, promotional and advertising campaign designed to convince men that they suffer from low testosterone. Defendant and the other companies orchestrated a national disease awareness media blitz that purported to educate male consumers about the signs of low testosterone. The marketing campaign consisted of television advertisements, promotional literature placed in healthcare providers' offices and distributed to users, and online media.

52.     The coordinated marketing, promotion and advertising, including massive TV and print advertising, suggest that various symptoms often associated with other conditions may be caused by low testosterone, and encourage men to discuss testosterone replacement therapy with their doctors if they experienced any of these symptoms. These symptoms include listlessness, increased body fat, and moodiness—all of which are general symptoms that are often a result of aging, weight gain, or lifestyle, rather than low testosterone.

53.     Since the FDA approved Testopel, Defendant and other unnamed pharmaceutical corporations sought to convince primary care physicians that low testosterone levels are widely

under-diagnosed, and that conditions associated with normal aging could be caused by low testosterone levels.

54.     What consumers received to treat these conditions, however, were not safe and effective drugs, but rather products that cause life threatening problems.

55.     Testopel may produce undesirable side effects to patients who use the drug, including but not limited to, myocardial infarction, stroke, deep vein thrombosis, pulmonary embolism and death.

56.     Secondary exposure to testosterone can cause side effects in others.  In 2009 the FDA issued a black box warning for AndroGel (another testosterone replacement therapy product), advising patients of reported virilization in children who were secondarily exposed to the gel.  Testosterone may also cause physical changes in women exposed to the drug and cause fetal damage in pregnant women who come into secondary contact with AndroGel.

57.     AndroGel was marketed as minimizing this risk of secondary exposure with the tag line "Beyond the Gel."

58.     Despite the risks and side effects, Defendant and other unnamed pharmaceutical corporations successfully created a robust and previously non-existent market for their drug. Defendant and other unnamed pharmaceutical corporations involved in the manufacture, sale, distribution, marketing and promotion of testosterone replacement therapy products collectively spent millions of dollars in promoting testosterone replacement therapy to convince millions of men to discuss testosterone replacement with their doctors. Consumers and physicians relied on Defendant's promises of safety and ease.

59.     Defendant and other unnamed pharmaceutical corporations involved in the manufacture, sale, distribution, marketing and promotion of testosterone replacement therapy

products collectively had sales over $2 billion in 2013. Sales of replacement therapies more than doubled since 2006, and are expected to triple to $5 billion by 2017, according to forecasts by Global Industry Analysts.[22]

60.     Millions were also spent by Defendant and other unnamed pharmaceutical corporations on unbranded marketing, advertising and promotion.

61.     The marketing program sought to create the image of, and belief in, consumers and physicians that low testosterone affected a large number of men in the United States and that the use of testosterone replacement products like Testopel is safe for human use, even though Defendant knew these statements to be false, and even though Defendant had no reasonable grounds to believe them to be true.

62.     Defendant promoted and marketed testosterone replacement therapy to physicians as a lifestyle drug that could treat a variety of symptoms caused by the normal aging process in males, including erectile dysfunction, loss of libido, loss of athleticism, loss of muscle mass, fatigue, and mood swings.  Defendant overstated the benefits of testosterone as a treatment for lifestyle changes associated with the aging process despite the fact that the drug was never approved by the FDA for these uses.

63.     Defendant concealed material, relevant information from potential testosterone therapy users and their physicians, and minimized user and prescriber concern regarding the safety of testosterone therapy, including but not limited to its known propensity to drastically increase hematocrit and estradiol in users.

---

[22] Shannon Pettypiece, "Are Testosterone Drugs the Next Viagra?" May 10, 2012, Bloomberg Businessweek, available at: http://www.businessweek.com/articles/2012-05-10/are-testosterone-drugs-the-next-viagra.

64.     The prescribing information and medication guide for Testopel, contained within the package materials, do not warn against stroke, pulmonary embolism, deep vein thrombosis, transient ischemic attack, cardiovascular disease, myocardial infarction, coronary heart failure, or any thromboembolic event not related to polycythemia.

**FDA Mandated Changes to Warnings**

65.     On June 19, 2014, and in response to post-market reports of venous blood clots unrelated to polycythemia in testosterone users, the FDA announced that it was requiring manufacturers of testosterone to include a general warning in the drug labeling of all approved testosterone products about the risk of venous thromboembolism (VTE), including deep vein thrombosis (DVT), and pulmonary embolism (PE).

66.     As a result of this FDA mandate, on June 21, 2014, the Defendant updated the prescribing information to provide the requisite warning regarding DVT and PE, and also updated the medication guide for testosterone therapy products to include the significant risk of PE, as follows: "Blood clots in the legs or lungs. Signs and symptoms of a blood clot in your leg can include leg pain, swelling, or redness. Signs and symptoms of a blood clot in your lungs can include difficulty breathing or chest pain."

67.     The prescribing information and the medication guide contained within the package materials still lack any warning about the risks of elevated estradiol levels or the need to screen for underlying clotting traits, and contain no warnings for strokes or cardiovascular injuries.

**SPECIFIC FACTUAL ALLEGATIONS**

68.     Plaintiff Anthony Jones presented to his treating physician(s) for symptoms that he associated with the condition known as "Low T.".

16

69.     As a result, Plaintiff Anthony Jones was prescribed Testopel for symptoms attributed to low testosterone.

70.     Plaintiff Anthony Jones underwent a procedure to implant 12 Testopel pellets under his skin on November 19, 2013.

71.     Plaintiff Anthony Jones relied on claims made by the Defendant that Testopel had been clinically shown to be a safe and effective way to raise testosterone levels.

72.     Prior to using Testospel, neither Anthony Jones nor his prescribing physician had knowledge of a connection between Testopel and deep vein thrombosis.

73.     There was no warning to Anthony Jones or his physician that the product presented a risk of deep vein thrombosis.

74.     Prior to using Testopel, Anthony Jones had no history of developing deep vein thrombosis.

75.     On January 16, 2014, Anthony Jones presented to the St. Elizabeth's Hospital in Gonzales, Louisiana after swelling and pain in his left leg.

76.     Physicians at St. Elizabeth's Hospital evaluated Anthony Jones and determined he was suffering from a deep vein thrombosis of the lower extremity.

77.     At the time of his admission to St. Elizabeth's Hospital on January 16, 2014, Anthony Jones was 70 years of age.

78.     Because of his use of the Testopel, Plaintiff Anthony Jones suffered a deep vein thrombosis and continues to suffer:

a.      loss of life's pleasures;

b.      fear and fright;

c.      embarrassment and humiliation;

      d.     economic loss;

      e.     requirement for medical monitoring relating to his injuries, including deep vein thrombosis;

      f.     past, present and future medical expenses.

79.     At the time of Plaintiff, Anthony Jones's deep vein thrombosis, Plaintiffs were unaware of any connection between his use of Testopel and the risk deep vein thrombosis.

80.     Plaintiffs incurred significant medical expenses as a result of the treatment Anthony Jones underwent to treat his injury, will incur future medical expenses as his injury is permanent, lost wages as a result of being unable to work, has suffered an impaired ability to labor and earn money, is at increased risk for future health problems and disability, and suffered physical pain and mental anguish.

81.     If Anthony Jones and his physicians had known the risks and dangers associated with Testopel, he would not have used Testopel and consequently would not have been subject to its serious side effects.

82.     Had Defendant properly disclosed the risks associated with the use of their product, Anthony Jones and his physicians would have avoided the risk of testopel by either not using testosterone replacement therapy at all, severely limiting the dosage and length of use, and/or by closely monitoring the degree to which the drug was adversely affecting his health.

83.     Had Plaintiff Anthony Jones and his physicians known the true risks associated with the use of testosterone medications, including Anthony Jones, he would not have injected the Anthony Jones, and/or would have been adequately monitored for its side effects, and as a result, would not have incurred the injuries or damages he did as a result of his use of Anthony Jones and seeks a maximum recovery as a matter of law.

**Punitive Damages Allegations**

84.     The acts, conduct, and omissions of Defendant, as alleged throughout this Complaint, were willful and malicious. Defendant committed these acts with a conscious disregard for the rights of the Plaintiffs and other Testopel users, and for the primary purpose of increasing Defendant's profits from the sale and distribution of Testopel. Defendant's respective outrageous and unconscionable conduct warrants an award of exemplary and punitive damages against Defendant in an amount appropriate to punish and make an example of Defendant.

85.     Prior to the manufacturing, sale, and distribution of Testopel, Defendant knew that their drug was defective and knew that those who were prescribed the medication would experience and did experience severe physical, mental, and emotional injuries. Further, Defendant, through their respective officers, directors, managers, and agents, knew that the medication presented a substantial and unreasonable risk of harm to the public, including Anthony Jones; and as such, Defendant unreasonably subjected consumers of said drugs to risk of injury or death.

86.     Despite their knowledge, Defendant, respectively acting through their officers, directors and managing agents for the purpose of enhancing Defendant's profits, knowingly and deliberately failed to remedy the known defects in their respective drugs and failed to warn the public, including Anthony Jones, of the extreme risk of injury occasioned by said defects inherent in their drugs.   Defendant and their agents, officers, and directors intentionally proceeded with the manufacturing, sale, distribution and marketing of their drugs knowing these actions would expose persons to serious danger, in order to advance Defendant's pecuniary interest and monetary profits.

87.     Defendant's respective conduct was despicable and so contemptible that it would be looked down upon and despised by ordinary decent people, and was carried on by Defendant with willful and conscious disregard for the safety of Anthony Jones, entitling Plaintiffs to exemplary damages.

## COUNT I
## STRICT PRODUCTS LIABILITY - MANUFACTURING DEFECT

88.     Plaintiffs incorporate each paragraph of this Complaint as if set forth fully herein and further alleges as follows.

89.     Testopel was designed, manufactured, marketed, promoted, sold, and introduced into the stream of commerce by Defendant.

90.     When it left the control of Defendant, Testopel was expected to, and did, reach the Plaintiff, Anthony Jones, without substantial change from the condition in which it left Defendant's control.

91.     Testopel was defective when it left Defendant's control and was placed in the stream of commerce, in that there were foreseeable risks that exceeded the benefits of the product and/or that it deviated from product specifications and/or applicable federal requirements, and posed a risk of serious injury including heart attack and death.

92.     Specifically, Testopel was more likely to cause serious injury and death than other similar medications.

93.     Plaintiff, Anthony Jones, used Testopel in substantially the same condition it was in when it left control of Defendant, and/or any changes or modifications were foreseeable by Defendant.

94. Plaintiff, Anthony Jones, and his healthcare providers did not misuse or materially alter the Testopel.

95. As a direct and proximate result of the Plaintiff, Anthony Jones's use of Testopel, he suffered serious physical injury including a deep vein thrombosis.

96. As a direct and proximate result of the Plaintiff, Anthony Jones's use of Testopel, Anthony Jones suffered physical and emotional damages, and economic loss, and will continue to suffer such harm, damages and economic loss in the future.

97. Defendant is strictly liable to Plaintiffs for designing, creating, manufacturing, distributing, selling, and placing Testopel into the stream of commerce, and for all damages caused to Anthony Jones by use of Testopel because the product was defective.

98. Defendant's actions and omissions as alleged in this Complaint constitute a flagrant disregard for human life, so as to warrant the imposition of punitive damages.

WHEREFORE, Plaintiffs respectfully request an award of compensatory and punitive damages, in addition to all costs, interest and fees, including attorneys' fees, to which they are entitled under law, and such other relief as this Honorable Court deems appropriate.

## COUNT II
## STRICT PRODUCTS LIABILITY – DESIGN DEFECT

99. Plaintiffs incorporate each paragraph of this Complaint as if set forth fully herein and further alleges as follows.

100. Testopel was not merchantable and/or reasonably suited to the use intended, and its condition when sold was the proximate cause of the injuries sustained by the Anthony Jones.

101.   Testopel was defective in design in that, when it left Defendant's control, the foreseeable risks of the product exceeded the benefits associated with its design, and it was more dangerous than an ordinary consumer or ordinary healthcare provider would expect.

102.   The foreseeable risks associated with Testopel's design include the fact that it is more dangerous than a reasonably prudent consumer or healthcare provider would expect when used in an intended or reasonably foreseeable manner.

103.   Testopel was in unsafe, defective, and inherently dangerous condition, which was unreasonably dangerous to its users and, in particular, Anthony Jones.

104.   Testopel was in a defective condition and unsafe, and Defendant knew, had reason to know, or should have known that it was defective and unsafe, even when used as instructed.

105.   The nature and magnitude of the risk of harm associated with the design of Testopel, including serious injury including heart attack and death, was high in light of the intended and reasonably foreseeable use of Testopel.

106.   The risks of harm associated with the design of Testopel were higher than necessary.

107.   It was highly unlikely that Testopel users would be aware of the risks associated with Testopel through either warnings, general knowledge or otherwise, and Anthony Jones specifically were not aware of these risks.

108.   The product's design did not conform to any applicable public or private product standard that was in effect when Testopel left the Defendant's control.

109.    Testopel's design was more dangerous than a reasonably prudent consumer would expect when used in their intended or reasonably foreseeable manner. It was more dangerous than Anthony Jones expected.

110.    The intended or actual utility of Testopel was not of such benefit or to justify the risk of serious injury including myocardial infarction.

111.    At the time Testopel left Defendant's control, it was both technically and economically feasible to have alternative designs that would not cause serious injuries including heart attack and/or death, or an alternative design that would have substantially reduced the risk of these injuries.

112.    It was both technically and economically feasible to provide a safer alternative product that would have prevented the injuries sustained by Anthony Jones and prevented the harm he suffered.

113.    The unreasonably dangerous nature of Testopel caused serious harm to Plaintiff.

114.    Defendant placed Testopel into the stream of commerce with wanton and reckless disregard for the public safety.

115.    As a direct and proximate result of Anthony Jones's use of Testopel, suffered serious physical and emotional harm, damages, and economic loss and will continue to suffer such harm, damages and economic loss in the future.

WHEREFORE, Plaintiffs respectfully request an award of compensatory and punitive damages, in addition to all costs, interest and fees, including attorneys' fees, to which they are entitled under law, and such other relief as this Honorable Court deems appropriate.

## COUNT III
## STRICT PRODUCTS LIABILITY – FAILURE TO WARN

116.     Plaintiff incorporates each paragraph of this Complaint as if set forth fully herein and further alleges as follows.

117.     Defendant had a duty to warn Plaintiff, Anthony Jones and his healthcare providers of the risk of serious injury, including myocardial infarction, associated with the use of Testopel.

118.     Defendant knew, or in the exercise of reasonable care should have known, about the risk of serious injury, including heart attack and/or death.

119.     Defendant failed to provide warnings or instructions that a manufacturer exercising reasonable care would have provided concerning the risk of serious injury, including heart attack and/or death, in light of the likelihood that their products would cause these injuries.

120.     Defendant failed to update warnings based on information received from product surveillance after Testopel was first approved by the FDA and marketed, sold, and used in the United States and throughout the world.

121.     A manufacturer exercising reasonable care would have updated its warnings on the basis of reports of injuries to men using Testopel after FDA approval.

122.     When the product left Defendant's control, Testopel was defective and unreasonably dangerous for failing to warn of the risk of serious injury including heart attack and/or death.

123.     Anthony Jones used Testopel for its approved purpose and in a manner normally intended and reasonably foreseeable by the Defendant.

124. Anthony Jones and his healthcare providers could not, by the exercise of reasonable care, have discovered the defects or perceived the danger because the risks were not open or obvious.

125. Defendant, as the manufacturers and distributors of Testopel, are held to the level of knowledge of an expert in the field.

126. The warnings that were given by Defendant were not accurate or clear, and were false and ambiguous.

127. The warnings that were given by the Defendant failed to properly warn physicians of the risks associated with Testopel, subjecting Anthony Jones to risks that exceeded the benefits to him. Anthony Jones, individually and through his physician, reasonably relied upon the skill, superior knowledge and judgment of the Defendant.

128. Defendant had a continuing duty to warn Anthony Jones and his prescriber of the dangers associated with its product.

129. Had Anthony Jones or his healthcare providers received adequate warnings regarding the risks associated with the use of the Testopel, he would not have used it.

130. As a direct and proximate result of Anthony Jones's use of Testopel and his reliance on Defendant's representations regarding the character and quality of the products and Defendant's failure to comply with federal requirements, Anthony Jones suffered serious physical and emotional harm, damages and economic loss, and will continue to suffer such harm, damages and economic loss in the future.

WHEREFORE, Plaintiffs respectfully request an award of compensatory and punitive damages, in addition to all costs, interest and fees, including attorneys' fees, to which they are entitled under law, and such other relief as this Honorable Court deems appropriate.

**COUNT IV**
**NEGLIGENCE**

131.    Plaintiffs incorporate each paragraph of this Complaint as if set forth fully herein and further alleges as follows.

132.    Defendant had a duty to exercise reasonable and ordinary care in the design, manufacture, sale, testing, quality assurance, quality control, labeling, marketing, promotions, and distribution of Testopel into the stream of commerce, including a duty to assure that their product did not pose an undue risk of bodily harm and adverse events, and to properly warn of all risks, and comply with federal requirements.

133.    Defendant failed to exercise reasonable and ordinary care in the design, manufacture, sale, testing, quality assurance, quality control, labeling, marketing, promotions and distribution of Testopel into the stream of commerce in that Defendant knew or should have known that the product caused significant bodily harm and was not safe for use by consumers. Specifically, Defendant failed to properly and thoroughly:

a.      test Testopel before releasing it into the market;

b.      analyze the data resulting from the pre-marketing tests of Testopel;

c.      conduct sufficient post-market testing and surveillance of Testopel; and

d.      provide appropriate warnings for consumers and healthcare providers, including disclosure of the known or potential risks or true or suspected rates of heart attack, stroke, deep vein thrombosis, pulmonary embolism and/or death.

134.    Despite the fact that Defendant knew or should have known that their product posed a serious risk of bodily harm to consumers, Defendant continued to manufacture and market Testopel for use by consumers and continued to fail to comply with federal requirements.

135.    Defendant knew or should have known that consumers such as Anthony Jones would foreseeably suffer injury as a result of Defendant's failure to exercise ordinary care as described above, including the failure to comply with federal requirements.

136.    It was foreseeable that Defendant's products, as designed, would cause serious injury to consumers, including Anthony Jones.

137.    The Defendant negligently and carelessly disregarded the applicable regulations and industry standards regarding the prohibition against off-label marketing, misbranding, and label expansion, and as a result many men, including Anthony Jones, were prescribed Testopel unnecessarily, and were therefore needlessly exposed to serious health risks for which there were no adequate warnings.

138.    As a direct and proximate result of Defendant's negligence, Anthony Jones suffered serious physical and emotional harm, damages and economic loss, and will continue to suffer such harm, damages and economic loss in the future.

139.    Defendant's conduct as described above, including but not limited to their failure to adequately design, test, and manufacture Testopel, as well as their continued marketing and distribution of the product, when they knew or should have known of the serious health risks it created and the failure to comply with federal requirements, evidences a flagrant disregard of human life so as to warrant the imposition of punitive damages.

140.    Defendant's actions and omissions as alleged in this Complaint demonstrate willful and wanton conduct, which warrants the imposition of punitive damages.

WHEREFORE, Plaintiffs respectfully request an award of compensatory and punitive damages, in addition to all costs, interest and fees, including attorneys' fees, to which they are entitled under law, and such other relief as this Honorable Court deems appropriate.

## COUNT V
## BREACH OF EXPRESS WARRANTY

141.     Plaintiffs incorporate each paragraph of this Complaint as if set forth fully herein and further alleges as follows.

142.     Defendant expressly warranted that Testopel was safe and effective for the treatment of low testosterone.

143.     Members of the consuming public, including consumers such as Anthony Jones and his healthcare providers, were intended third party beneficiaries of the warranty.

144.     Anthony Jones and his healthcare providers reasonably relied on these express representations.

145.     The Testopel manufactured and sold by Defendant did not conform to these express representations because Defendant did not disclose the material risks that Testopel could cause serious injury including myocardial infarctions, strokes, deep vein thrombosis, pulmonary embolism and/or death.

146.     The Testopel manufactured and sold by Defendant did not conform to these express representations because the product caused harm to Anthony Jones when used as recommended and directed.

147.     As a direct and proximate result of Defendant's breach of warranty, Plaintiff suffered serious physical and emotional harm, damages and economic loss, and will continue to suffer such harm, damages and economic loss in the future.

WHEREFORE, Plaintiffs respectfully request an award of compensatory and punitive damages, in addition to all costs, interest and fees, including attorneys' fees, to which they are entitled under law, and such other relief as this Honorable Court deems appropriate.

## COUNT VI
## BREACH OF IMPLIED WARRANTY

148.    Plaintiffs incorporate each paragraph of this Complaint as if set forth fully herein and further alleges as follows.

149.    When Defendant designed, manufactured, marketed, sold, and distributed their Testopel for use by Anthony Jones, Defendant knew of the use for which the product was intended and impliedly warranted the product to be of merchantable quality and safe for such use and that the designs, manufacture, labeling, and marketing complied with all applicable federal requirements.

150.    Anthony Jones and his physicians reasonably relied upon the Defendant's representations of the product's merchantable quality that it was safe for its intended use, and that it was in compliance with all federal requirements.

151.    Contrary to such implied warranty, Testopel was not of merchantable quality or safe for intended use because the product was defective, as described herein, and failed to comply with federal requirements.

152.    As a direct and proximate result of Defendant's breach of warranty, Anthony Jones suffered serious physical and emotional harm, damages and economic loss, and will continue to suffer such harm, damages and economic loss in the future.

WHEREFORE, Plaintiffs respectfully request an award of compensatory and punitive damages, in addition to all costs, interest and fees, including attorneys' fees, to which they is entitled under law, and such other relief as this Honorable Court deems appropriate.

## COUNT VII
## FRAUD

153.    Plaintiffs incorporate by reference here each of the allegations set forth in this Complaint as though set forth fully herein.

154.    Defendant, from the time they first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed Testopel, and up to the present, willfully deceived Anthony Jones, his physicians, and the general public by concealing the true facts concerning Testopel, which the Defendant had a duty to disclose.

155.    At all times herein mentioned, Defendant conducted a sales and marketing campaign to promote the sale of Testopel and willfully deceived Anthony Jones, his physicians, and the general public as to the benefits, health risks and consequences of using Testopel. Defendant knew that Testopel was not safe, fit and effective for human consumption, that using Testopel was hazardous to health, and that Testopel had a serious propensity to cause serious injuries to users, including but not limited to the injuries Anthony Jones suffered.

156.    Defendant knowingly, falsely, deceptively, and inaccurately designated the physiologic decrease in men's testosterone levels and the age-related symptoms men experience with aging as a form of acquired hypogonadism, with the intent to deceive physicians into prescribing Testopel for off label indications for clinical use; to engage in "label expansion" of the Testopel product; and to drive increasing consumer and patient demand for Testopel prescriptions.

157.    Defendant knowingly, falsely, deceptively, and inaccurately designated and represented that the physiologic decline in men's testosterone levels and the age-related symptoms men experience with advancing age, as a form of acquired hypogonadism, with the

intent to deceptively foster the belief by consumers and patients, including Anthony Jones, that they harbored a "disease" or pathologic medical condition that was appropriately treated with the Testopel product.

158.    Defendant concealed and suppressed the true facts concerning Testopel with the intent to defraud Anthony Jones and his physicians, in that Defendant knew that Anthony Jones's physicians would not prescribe Testopel, and Anthony Jones would not have used Testopel, if they were aware of the true dangers of the product.

159.    Defendant knew, understood, and intended that consumers would rely upon the comprehensive medical information that they provided to consumers and patients through their multi-platform marketing, promotional, educational, and awareness campaigns concerning the Testopel product and its indications for clinical use; and further knew that consumers and physicians would make treatment choices and exercise treatment options about the use of the Testopel product in reliance upon this information.

160.    Anthony Jones and his physicians relied on the fraudulent and deceptive representations made by the Defendant to their detriment.  Specifically, Anthony Jones and his physicians relied on representations that low testosterone was an actual disease that required medical treatment, and that use of Testopel was a safe and effective treatment for his condition.

161.    Anthony Jones would not have sought or continued treatment for low testosterone or used Testopel had he or his physicians been provided with adequate, true, accurate, and correct information by Defendant about the risks of cardiovascular events, cerebrovascular accident, and death associated with the use of Testopel.

162.     As a direct and proximate result of Defendant's breach of warranty, Anthony Jones suffered serious physical and emotional harm, damages and economic loss, and will continue to suffer such harm, damages and economic loss in the future.

WHEREFORE, Plaintiffs respectfully request an award of compensatory and punitive damages, in addition to all costs, interest and fees, including attorneys' fees, to which they are entitled under law, and such other relief as this Honorable Court deems appropriate.

## COUNT VIII
## NEGLIGENT MISREPRESENTATION

163.     Plaintiffs incorporate by reference herein each of the allegations set forth in this Complaint as though fully set forth herein.

164.     From the time Testopel was first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed, and up to the present, Defendant made misrepresentations to Anthony Jones, Anthony Jones's physicians, and the general public, including but not limited to the misrepresentation that Testopel was safe, FDA approved to treat "Low T," and effective for human use. Defendant conducted a sales and marketing campaign to promote the sale of Testopel and willfully deceived Anthony Jones, his physicians, and the general public as to the health risks and consequences of the use of Testopel.

165.     The Defendant made the foregoing representations without any reasonable grounds for believing them to be true. These representations was made directly by Defendant, by sales representatives and other authorized agents of Defendant, and in publications and other written materials directed to physicians, medical patients and the public, with the intention of inducing reliance and the prescription, purchase and use of the subject products.

166.    The representations by the Defendant were in fact false, in that Testopel was not safe, fit and effective for human consumption, using Testopel was hazardous to health, and Testopel had serious propensity to cause serious injuries to users, including but not limited to the injuries suffered by Anthony Jones.

167.    The foregoing representations by Defendant were made with the intention of inducing reliance and the prescription, purchase and use of Testopel.

168.    Anthony Jones relied on these misrepresentations to his detriment. Specifically, Anthony Jones relied on misrepresentations that Testopel was a safe and effective treatment for his low testosterone.

169.    In reliance of the misrepresentations by the Defendant, Anthony Jones was induced to purchase and use of Testopel.  If Anthony Jones had known of the true facts (facts concealed by the Defendant), he would not have used Testopel. This reliance upon Defendant's misrepresentations was justified because such misrepresentations were made and conducted by individuals and entities that were in a position to know the true facts.

170.    As a direct and proximate result of Defendant's breach of warranty, Anthony Jones suffered serious physical and emotional harm, damages and economic loss, and will continue to suffer such harm, damages and economic loss in the future.

WHEREFORE, Plaintiffs respectfully request an award of compensatory and punitive damages, in addition to all costs, interest and fees, including attorneys' fees, to which they are entitled under law, and such other relief as this Honorable Court deems appropriate.

## COUNT IX
## LOSS OF CONSORTIUM

171.     Plaintiffs incorporate by reference herein each of the allegations set forth in this Complaint as though fully set forth herein.

172.     At all relevant times stated herein, Plaintiff Laura Jones was and is the wife and spouse of Plaintiff Anthony Jones.

173.     As a result of the injuries sustained by Plaintiff Anthony Jones, as set forth above, Plaintiff Laura Jones has suffered loss of consortium, including but not limited to, mental anguish and the loss of her husband's support, services, society, companionship, comfort, affection, love and solace.

174.     As a result of the injuries sustained by Plaintiff Anthony Jones, as set forth above, Plaintiffs James and Laura Jones have sustained damage to their marital relationship.

WHEREFORE, Plaintiffs respectfully request an award of compensatory and punitive damages, in addition to all costs, interest and fees, including attorneys' fees, to which they are entitled under law, and such other relief as this Honorable Court deems appropriate.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully requests that this Court enter a judgment against the Defendant and in favor of the Plaintiffs and to award the following relief:

A.     General damages in an amount according to proof at time of trial;

B.     Special damages in an amount within the jurisdiction of this Court and according to proof at the time of trial;

C.     Loss of earnings and impaired earning capacity;

D.     Medical expenses;

E.     Emotional and mental distress;

F.      Restitution, disgorgement of profits, and other equitable relief;

G.      Injunctive relief;

H.      Attorney's fees and cost of suit incurred herein;

I.      Pre-judgment interest as provided by law; and

J.      Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

The Plaintiffs hereby demand a trial by jury on all counts and as to all issues.

Respectfully Submitted,

Lopez McHugh, LLP

Dated: 1/15/2015

James J. McHugh, Jr. (PA 65809)
Carrie R. Capouellez (PA 91578)
Andrew W. Knox (PA 306899)
1123 Admiral Peary Way, Quarters K
Philadelphia, PA 19112
Telephone: (215) 952-6910
Facsimile: (215) 952-6914
*Attorneys for Plaintiff*

35